IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COOKEVILLE DIVISION

| | |
|---|---|
| JAMES W. SMOAK, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | NO. 2:03-0117 |
| ) | JUDGE HAYNES |
| ERIC HALL, et al., ) | |
| ) | |
| Defendants. ) | |

**M E M O R A N D U M**

Plaintiffs, James W. Smoak, Pamela Smoak and Brandon Hayden, citizens of North Carolina, filed this action under 42 U.S.C. § 1983 against the Defendants David Bush, Jeff Phann, Brian Bock, and Jerry Anderson, members of the Tennessee Highway Patrol ("THP") as well as other Defendants.[1] Plaintiffs' claims arise out of the Defendant's detention of them on the interstate highway during which their dog was shot and killed. Plaintiffs assert claims for violation of their Fourth Amendment rights due to the Defendants' unlawful seizure of them and use of excessive use of force during their detention. Plaintiffs also assert several state common law claims under the federal diversity statute, 28 U.S.C. § 1332.

Before the Court is the Defendants' motion for summary judgment (Docket Entry No. 58) contending, in sum, that the Plaintiffs' proof is insufficient to support a judgment on any of their § 1983 and state law conspiracy claims and that the Defendants are entitled to qualified immunity on the Plaintiffs' § 1983 claims. In their response, Plaintiffs assert that their proof is sufficient and that the qualified immunity defense does not bar their claims.

---

[1] The other Defendants were dismissed by Agreed Order. (Docket Entry No. 53).

## A. Review of the Record[2]

On January 1, 2003, Plaintiffs were traveling to North Carolina from Nashville when James Smoak left his wallet on the roof of his vehicle at a gas station. The wallet fell off the vehicle and later a woman called the Tennessee Highway Patrol ("THP") to report a green station wagon going at least 100 mph with money flying everywhere. Shanon Pickard, a THP dispatcher who took the call, requested troopers to respond and THP troopers met with the woman who had stopped and began to pick up the money. A THP trooper reported to Pickard that currency was found at the scene, but Pickard was not initially informed that the amount was $445.00.

Pickard then called local law enforcement dispatchers to inquire of any robbery reports. Pickard told the City of Cookeville police dispatchers to look for a green station wagon traveling at a high rate of speed. Pickard also sent a teletype message to area law enforcement for information about a "recent robbery." (Pickard Deposition pp. 68-69). (Pickard Deposition, Exhibit I thereto).

Brock, the City of Cookeville dispatcher who answered Pickard's call issued a BOLO (be on the lookout) for the green station wagon that reportedly had been seen traveling at a high

---

[2]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The Court concludes that there are material factual disputes. Thus, this section does not constitute a findings of fact under Fed.R.Civ.P. 56(d).

rate of speed and losing a large amount of currency. McHood, a THP trooper, could not remember if the dispatcher reported any robbery. (McHood Deposition at p. 54). McHood later saw a teletype referring to a "robbery," id. and McHood relayed a message that the green station wagon was involved in a "possible robbery," but "we're not sure," id. at 55 and issued a second BOLO. McHood received another call that the wallet belonged to a James Smoak and that a South Carolina identification had been found with the money, but McHood did not ask the amount. Id. at 47. McHood told a trooper "still no word of any money stolen." Id. at 48.

David Bush, a THP trooper spotted the Smoak vehicle and followed the Smoaks' station wagon for approximately eight miles, without observing any speeding or incident. (Bush Deposition p. 15). Bush's information was from the BOLOs of currency coming out of a speeding green station wagon and a "possible recent robbery." Id. at p. 14, 31. Bush requested license plate information from the THP's Cookeville dispatchers who inquired of Pickard, the THP dispatcher in Nashville who reported a match with the identification. McHood told Bush of the match and that Nashville wanted the vehicle stopped with back-up support of other troopers. (Bush Deposition pp. 17, 43). Bush requested back-up and Brock called the City of Cookeville police dispatchers. (Brock Deposition p. 15). Brock told the City dispatchers that the suspects may have been involved in an "possible armed robbery." (Brock Deposition p. 34-35). Two THP troopers and Cookeville police officers responded.

Bush had been a trooper for nine years with the THP and had conducted six felony stops involving stolen vehicles. Bush explained that his training was that "if there's any probability that a felony has occurred we treat that as a high-risk stop. Id. at p. 21. (emphasis added). According to Bush's testimony, a report of speeding vehicle with money coming out of it, would

not be treated as warranting a felony stop or a need for additional troopers. Id. at pp. 25-26. Bush initiated the stop and conducted a high-risk or felony stop of the Plaintiffs. The entire stop was videotaped from Bush's vehicle.

On the videotape, the Defendants are armed and the Plaintiffs are instructed to leave the vehicle with their hands up and to get on their knees. On the videotape, Plaintiffs ask the officers to close the doors. James Smoak tells Bush that there are dogs in the car and asked that the doors be shut. Pamela Smoak also requested several times that the door be closed so the dogs would not get out. At one point, Pamela Smoak screamed at the officers, "Just please shut the door." (P. Smoak Deposition p. 271). Brandon Hayden also told Phann to shut the door, or allow him to shut the door himself, but Hayden was told not to move. About 30 seconds to a minute elapsed when Andrews cleared the vehicle and closed the driver's door on the passenger side. (J. Andrews Deposition p. 63).

The Defendants then approach Plaintiffs to handcuff them. The City of Cookeville police officers were displaying their weapons. While the Smoaks are being handcuffed, the Smoaks again tell the officers that their dogs in the vehicle. Bush is with James Smoak and Phann is handcuffing Brandon Hayden when a dog jumps from the vehicle. The dog jumped from the vehicle after the Smoaks had previously asked that the door be closed. The videotape shows the dog in the view of the three members of the Smoak family circling and wagging its tail and moving in a circular manner. According to James Smoak, Hall turns around to get in the dog's path. (J. Smoak Deposition pp. 155-156; P. Smoak Deposition p. 66; B. Hayden Deposition p. 30). As the dog moves wagging its tail and moving in a circular manner, Eric Hall, a City of Cookeville officer backs up and shoots and kills the dog. From his vantage point,

4

James Smoak denies the dog was moving towards Hall.

James Smoak then springs up from his knees and begins to move toward Hall and the dog, but Andrews and Bush restrained him. James Smoak loses his balance and falls to his knees. James Smoak describes his legs as swiped from under him, throwing him to the ground. Pamela Smoak also stands up after the dog is shot, but the City of Cookeville officers point their guns at her. The Smoaks are then placed in patrol vehicles. Bush testified that none of the Plaintiffs acted as if he or she were about "to engage in criminal activity." (Bush Deposition p. 13-16).

James Smoak suffered injuries to his knee, wrists, and head and went to the hospital that night and later underwent arthroscopic surgery. (J. Smoak Deposition pp, 41, 110). James Smoak described the emotional trauma of witnessing a shotgun pointed at his wife, being ordered out of his vehicle and onto his hands, witnessing his family pet being killed, being handcuffed and placed in a patrol car, being detained for almost thirty (30) minutes, and being subjected to the officer's hostility before and after his release. Pamela Smoak and Hayden also testified to the emotional trauma from these events.

With the Plaintiffs in the patrol cars, Bush called dispatch for specific charges and was told there was not a robbery. (Bush Deposition p. 71, McHood Deposition pp. 66-67; Brock Deposition p. 17). At that point, Bush determined a mistake had been made and released the Smoaks. (Bush Deposition pp.71-72). The incident lasted 29 minutes.

Andrews and Phann, however, who were both present, testified that they would not have conducted a felony stop, if they had all of the facts available at the time. (Andrews Deposition at p. 45 and Phann Deposition at p. 31) Andrews described another method for a vehicle stop short

5

of a felony stop. (Andrews Deposition p. 59). Based upon the information available, Pickard and the THP dispatcher "joked" that someone had probably lost their money, and stated that it sounded like something his kids would do. (Pickard Deposition pp. 50-51).

Plaintiffs offer the expert testimony of Michael Cosgrove, who opines that the felony stop of the Smoak vehicle initiated by Bush was unreasonable, unnecessary, and inconsistent with professional police practices and standards. (Docket Entry No. 66, Cosgrove, Affidavit ¶ 26). Given the totality of the circumstances, Cosgrove opines that these officers lacked reasonable suspicion to believe that they were confronting robbery suspects or that this family was armed and dangerous. Id.

### B. Conclusions of Law

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an

6

> otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.
>
> <u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment</u>. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 355-57 (6th Cir. 1989). But <u>see</u> <u>Routman v. Automatic Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in <u>Celotex</u>

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

<u>Celotex</u>, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule

7

Case 2:03-cv-00117 Document 78 Filed 08/26/05 Page 7 of 19 PageID #: 65

56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrating the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that

> The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1480 (cites omitted). See also Hutt v. Gibson Fiber Glass Products, No. 89-5731 (6th Cir. filed September 19, 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." quoting Liberty Lobby)).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

More important for present purposes, <u>summary judgment will not lie if the dispute about a material fact is `genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.</u>

\* \* \*

Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.</u> If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.</u> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- `whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'</u>

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:

[I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: `The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Company, 791 F.2d. 43, 46 (6th Cir. 1986) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion) (citation omitted).

9

The Court of Appeals further explained the District Court's role in evaluating the proof on a summary judgment motion

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).
>
> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) cert. denied 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). Here, the parties have given some references to the proof upon which they rely. Local Rule 8(b)(7)(A) and (C) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

10

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6. As on federal directed verdict motions, the `scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the `old era' in evaluating the respondent's evidence. The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is implausible.

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

11

As the Defendants' qualified immunity contentions, in <u>Siegert v. Gilley</u>, 500 U.S. 226, 231 (1991), the Supreme Court addressed the proper analytical framework for determining qualified immunity and the first step is to decide if a federal right is presented.

> We have on several occasions addressed the proper analytical framework for determining whether a plaintiff's allegations are sufficient to overcome a defendant's defense of qualified immunity asserted in a motion for summary judgment. Qualified immunity is a defense that must be pleaded by a defendant official. <u>Gomez v. Toledo</u>, 446 U.S. 635, 64 L.Ed.2d 572, 100 S.Ct. 1920 (1080); <u>Harlow</u>, 457 U.S. at 815, 73 L.Ed.2d 396, 102 S.Ct. 2727. Once a defendant pleads a defense of qualified immunity, "[o]n summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. . . . Until this threshold immunity question is resolved, discovery should not be allowed." <u>Id</u>. at 818, 102 S.Ct. 2727, [73 L.Ed.2d 396].
>
> * * *
>
> In Harlow we said that "[u]ntil this threshold immunity question is resolved, discovery should not be allowed." <u>Harlow</u>, <u>supra</u>, at 818, 102 S.Ct. at 2738 (emphasis added). <u>A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is "clearly established" at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all. Decision of this purely legal question permits courts expeditiously to weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on its merits</u>. One of the purposes of immunity, absolute or qualified, is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit. In <u>Mitchell v. Forsyth</u>, <u>supra</u>, we said:
>
>> Harlow thus recognized an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law. The entitlement is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.

<u>Id.</u> at 231-32.

In <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001), the Supreme Court stated a two step test for

12

qualified immunity: (1) whether "the facts alleged show the officer's conduct to violate constitutional right;" and (2) "whether the right was clearly established . . . in light of the specific context of the case, not as a broad general proposition . . . ." Summary judgment is inappropriate, if genuine factual disputes on an issue critical to the immunity question exist, such that it cannot be determined before trial whether the defendant's acts violate clearly established rights. Pray v. Sandusky, 49 F.3d 1154 (6th Cir. 1995); Mackey v. Dyke, 29 F.3d 1086, 1095 (6th Cir. 1994).

Plaintiffs' Fourth Amendment claims arise in the specific context of police officers' reliance on a police dispatcher or bulletin reporting an ongoing possible crime. In United States v. Hensley, 469 U.S. 221 (1985), the Supreme Court address that issue and held as follows:

> We conclude that <u>if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on the flyer or bulletin justified a stop to check identification</u> . . . <u>To pose question to the person or to detain the person briefly while attempting to obtain further information</u> . . . <u>If the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment</u> . . . <u>It is the objective reading of the flyer or bulletin that determines wither other police officers can defensibly act in reliance on it</u> . . . Assuming the police makes a <u>Terry</u> stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who issued the flyer or bulletin possessed a reasonable suspicion justifying, a stop, United States v. Robinson, supra, and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department . . .
>
> When the Covington officers stopped Hensley, they were authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop . . .

Id at 232-33, 235.

A <u>Terry</u> stop requires specific and articulable facts from the issuing officer to show "reasonable suspicion" that the individual has been involved in criminal activity. Joshua v.

13

DeWitt, 341 F.3d 430, 440 (6th Cir. 2003). If the THP dispatcher had sufficient information to establish reasonable suspicion for a Terry stop, then the Defendants stop is permissible. Hensley, 469 U.S. at 231. But if the dispatcher lacked sufficient information to satisfy the reasonable suspicion requirement, and the officer's subsequent observations did not produce reasonable suspicion, then the stop violated the Fourth Amendment.

At the time of these events, the Sixth Circuit, held that reasonable suspicion does not have to be based on an officer's personal observation, but can be based on informant tips or dispatcher information. U.S. v. Erwin,155 F. 3d 818, 822 (6th Cir. 1998); U.S. v. Hardnett, 804 F.2d 353, 356 (6th Cir. 1986). Factual inferences by the law enforcement officer must be given "due weight," but "a mere hunch" is insufficient. United States v. Arvizu, 534 U.S. 273. The totality of the circumstances must be considered even if none of the factors alone establishes reasonable suspicion. Id.

Here, an eyewitness reported a green station wagon traveling 100 miles per hour with money coming from the vehicle THP troopers found an identification and wallet at the scene, and the identification matched the Smoak vehicle. McHood introduced the suspicion of a possible robbery for which he did not have any factual bases. Brock introduced the idea of a "possibly armed robbery" without any basis. Bush followed the vehicle for eight miles without observing any suspicious activity. When the facts are viewed in a light most favorable to the Plaintiffs, as required on this type of motions, these Defendants conducted a high-risk felony stop without knowledge on specific articulable facts of any actual crime that had been committed, without any knowledge of the identity of the suspects involved in any possible crime might be, and without any knowledge that the people they were stopping may be armed and

14

dangerous. A trier of fact could conclude that the Defendants lacked reasonable suspicion for this stop.

As noted in Hensley, the next issue is whether the stop that in fact occurred was not significantly more intrusive than necessary. Defendants cites decisions that officers approaching a person seated in a automobile presents an "inordinate risk" and "especially fraught with danger to police officers," quoting Pennsylvania v. Mimms, 434 U.S.106,110 (1977) and citing Long v. Michigan, 463 U.S. 1032, 1047, (1983) and Maryland v. Wilson, 519 U.S. 408, 413 (1997). In Mimms, the Supreme Court ruled that upon a lawful stop, a police officer may order the driver out of the vehicle, 434 U.S. at 110-111, n.6, and Wilson authorizes the police officer to order the passenger as well. 513 U.S. at 413. Wilson did not authorize continued detention. Id. at 415, n.3.

As to when police officers may draw their weapons during a stop, in Long, the Supreme Court stated: "When the officer has a reasonable belief 'that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm'." 463 U.S. at 1047 (quoting Terry, 387 U.S. at 24). In Houston v. ClarkCounty Sheriff Deputy Does, 174 F.3d 809, 814, 815 (1999), the Sixth Circuit stated: "When police officers reasonably fear that suspects are armed and dangerous, they may order the suspects out of a car and may draw their weapons when those steps are reasonably necessary for the protection of the officers." Defendants rely also upon Gallegos v. City of Los Angeles, 308 F.3d 987 (9th Cir. 2002), but in Gallegos a crime was actually committed.

Here, a crime had not been committed and there were not any facts of an armed robbery.

15

Case 2:03-cv-00117   Document 78   Filed 08/26/05   Page 15 of 19 PageID #: 73

Bush testified that a report of a speeding vehicle with money coming out of it would not justify a felony stop. Andrews described a lee intrusive measure for officer safety in this situation. The officers ordered the Smoak family members out of their station wagon, one by one, over a loudspeaker, while guns were aimed at them. The Smoaks and her teenage son, Brandon, each individually walked backward with their hands in the air behind the car as ordered and got down on their knees. Five officers at the scene then approached the family. Plaintiffs were out of the vehicle and on their knees with their hands behind them when they were approached by the officers in the manner described. They were handcuffed while two officers who were less than five feet away kept a shotgun and an assault rifle pointed on the family. The family's pleas for the officers to close the car doors to prevent the dogs from escaping went unanswered. Their family dog was killed without apparent justification. Immediately after the shotgun was fired, it was pointed directly at the head of Mrs. Smoak and her teenage son, Brandon. The Plaintiffs were then separated while handcuffed, and placed in separate squad cars.

    After the dispatcher informed Bush that there were no charges and a check of James Smoak's driver's license failed to show that James Smoak was wanted for any crime, Bush and Andrews determined a mistake had been made. (Bush Deposition pp. 7 1-72; Andrews Deposition p. 42). Pamela Smoak and Brandon were released. However, Mr. Smoak was released, upon a promise that he would "promise not to do anything crazy." Plaintiffs were detained for 29 minutes. Plaintiffs note that Bush and Cookeville police officer who shot their dog are observed grinning or laughing in their presence. These facts viewed in a light most favorable to Plaintiffs, could lead the trier of facts to find that the circumstance of Smoak's manner of the seizure was unreasonable.

16

Case 2:03-cv-00117   Document 78   Filed 08/26/05   Page 16 of 19 PageID #: 74

Plaintiffs argue that the circumstances their seizure became an arrest that requires probable cause. To determine if a suspect is under arrest, courts must ask whether a person was in the physical control or submitted to the officers' show of force, California v. Hodari D.,499 U.S.621, 626 (1991) or the circumstances were such that a "reasonable person would have believed he was not free to leave." United States v. Hatfield, 815 F.2d 1068, 1070-1071 (6th Cir. 1987). Absent physical control, [e]xamples of circumstance that might indicate a seizure, even where the person did not attempt to leave, would be thenthreatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." United States v Mendenhall, 446 U.S. 544, 554 (1980). An investigatory stop also rises to the level of arrest when the number of oppressive elements present at the stop is not justifiable given the limited evidence of crime, and lack of indication that suspects are armed or dangerous. Olivera v. Mayer, 23 F.3d 642, 645-46 (2nd Cir. 1994).

The Sixth Circuit has recognized that an officer has "crossed the line" into an arrest when they place a suspect into a police vehicle for questioning, United States v. Richardson, 949 F.2d 851, 857 (6th Cir. 1991), unless the circumstances render it reasonable. United States v. Jacob, 377 F.3d 573, 578-79 (6th Cir. 2004)(drug arrest) The use of handcuffs does not exceed Terry's limits. Houston, 174 F3d at 815. Additionally, while a show of force does not necessarily convert a stop into an arrest, an officer's approach to a car with guns drawn and ordering of the suspect has been referred to as being highly intrusive and in some circumstances would be tantamount to an arrest. United States v. Hardnett, 804 F.2d 353, 357 (6 th Cir. 1986). When investigative stops are made at gunpoint, the officers must possess a justifiable fear of safety. Id

17

Any "detention must be temporary and last no longer than is necessary" and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." (1983).

From the Court's view of the tape and for the reasons stated above on the seizure of these Plaintiffs, a trier of fact could reasonably conclude that circumstances of this seizure was in effect an arrest and was an excessive reaction beyond the limited information given to the officers. The Court notes that Andrews described a less intrusive method of seizure that was known and available to the officers.

Plaintiffs also assert a claim of excessive force during their arrest or investigatory stop. This claim is evaluated on whether the force applied was objectively reasonable under the Fourth Amendment standards. Graham v. Connor, 490 U.S. 386, 394-395 (1989). It is well recognized that a law enforcement officer has the right to use such force as may be necessary to accomplish a legitimate law enforcement goal. Id. at 396. Determining what is objectively reasonable requires consideration of the facts of a case, including the seriousness of the crime, whether the suspect could be an immediate threat to the safety of officers or others and whether the suspect is trying to resist arrest. Id. at 396.

Prior to the dog being shot, James Smoak is on his knees, as instructed. After the shot, he jumps up and moves towards the two Cookeville officers. While his body leans forward, he is held back by Bush. Bush and Andrews then pull James Smoak back towards them and he and Andrews fall to their knees. According to his deposition, James Smoak's head hits the ground. (Smoak Deposition p. 326). This is not visible from the video, but his head is out of view for a moment after he falls to his knees. The officers did not strike or apply any other force to James

18

Smoak. The Court does not discern any actual excessive force from this aspect of the Smoaks detention.

Plaintiffs assert a conspiracy claim that the officers at the scene "subsequently participated in a common design through a concert of action to protect fellow officer, Hall, by making overtly false statements in their reports and to the media regarding the circumstance surrounding the aforementioned incident." (Amended Complaint ¶ 91). Smoak contends that the officers statements in their reports that the dog barked was false and is evidence of the conspiracy, (J. Smoak Deposition pp. 266, 328). This fact, without more would not support a judgment or a conspiracy claim. See Agg.v. Flanagon, 855 F.2d 336, 341 (6th Cir. 1988).

Thus, the Defendants motion for summary judgment on the Plaintiffs conspiracy claim should be granted.

An appropriate Order is filed herewith.

**ENTERED** this the 26th day of August, 2005.

WILLIAM J. HAYNES, JR.
United States District Judge